Moises **GALINDO**, Plaintiff-Appellant,

v.

**PRECISION AMERICAN CORP.,** et al., Defendants,

**Georgia Pacific Corporation,** Defendant-Appellee.

No. 84–2488
Summary Calendar.

United States Court of Appeals, Fifth Circuit.

March 11, 1985.

Rehearing and Rehearing En Banc Denied April 29, 1985.

Washington & Randle, Sarnie A. Randle, Jr., Houston, Tex., for plaintiff-appellant.

Robert A. Rowland, III, Houston, Tex., for defendant-appellee.

Before RUBIN, RANDALL and TATE, Circuit Judges.

RANDALL, Circuit Judge:

Georgia-Pacific Corporation operates a large number of sawmills and manufacturing plants. In 1978, Georgia-Pacific sold an obsolete sawmill trimmer from its plant in El Dorado, Arkansas, to a used equipment dealer. The trimmer was eventually sold to Moises Galindo's employer and was involved in an accident in which Galindo was severely injured. This appeal presents the question whether, by virtue of the 1978 sale and other sales of used equipment, Georgia-Pacific is "engaged in the business of selling" such equipment for purposes of the doctrine of strict liability for product defects under section 402A of the Restatement (Second) of Torts. We conclude from the record before us that unresolved questions of fact preclude an answer to that question at this point in the litigation. Accordingly, we vacate the summary judgment in favor of Georgia-Pacific.

## I.

### Background

The few facts that have been developed thus far are not in dispute. Moises Galindo (Galindo) worked for Middlebrook Lumber Company (Middlebrook) at a sawmill in Nacogdoches, Texas. On August 21, 1980, he suffered severe injuries while operating a sawmill trimmer. Galindo alleges that the defective condition of the trimmer caused his injuries. Following the accident, he filed this diversity lawsuit for damages under Texas law against several parties that he claims manufactured or marketed the allegedly defective trimmer.

Galindo's complaint alleges that Georgia-Pacific Corporation (Georgia-Pacific) once owned the trimmer that caused his injuries. According to the first amended complaint, Georgia-Pacific sold the trimmer to defendant Modern Iron Works, Inc., (Modern Iron Works) who in turn sold it to Middlebrook. It is undisputed that from 1960 to 1978 Georgia-Pacific in fact owned a trimmer similar to the one involved in Galindo's accident. Georgia-Pacific[1] purchased a new trimmer in 1960 and used it at its El Dorado, Arkansas, plant until 1978. In

---

1. Actually, the trimmer was purchased by Reynolds & Draper Lumber Co., which owned the Arkansas plant in 1960. Georgia-Pacific purchased the Arkansas plant from Reynolds & Draper in 1969.

1978, the trimmer was sold to Vincent Rice (Rice). If Georgia-Pacific's trimmer is the one involved in Galindo's accident, Rice must have sold it to Modern Iron Works who in turn sold it to Middlebrook.[2]

Georgia-Pacific moved for summary judgment on the ground that, even if it sold the trimmer involved in Galindo's accident, and even if the trimmer is defective, Georgia-Pacific is not liable for Galindo's injuries because Georgia-Pacific is not engaged in the business of selling sawmill trimmers. According to the motion for summary judgment, Georgia-Pacific's sale of the trimmer was an isolated, "occasional" sale upon which strict liability may not be premised.

The district court granted summary judgment on the strength of an affidavit from Georgia-Pacific which avers that Georgia-Pacific "is not in the business of selling trimmers." The affidavit establishes that Georgia-Pacific sold the trimmer to Rice in 1978 because it was no longer needed in the operation of the Arkansas plant. The affidavit also establishes, however, that sale to equipment dealers and other parties is one of three ways that Georgia-Pacific regularly disposes of equipment that is no longer needed at its various plants and sawmills; Georgia-Pacific also sometimes "scraps" used equipment or transfers it to other places within the corporation.

Galindo opposed the motion for summary judgment on the ground that Georgia-Pacific's affidavit itself establishes that the company is engaged in the business of selling trimmers and other used sawmill equipment. The affidavit demonstrates, in Galindo's view, that sale of used equipment is a regular means of disposition. Answers to interrogatories reveal that Georgia-Pacific operates more than 240 plants and mills around the world. From this, Galindo argued that Georgia-Pacific's sales of used equipment are extensive enough to constitute a "business" in which Georgia-Pacific is "engaged." [3]

Noting the absence of relevant Texas caselaw, the district court made an *"Erie* guess" that

> the Texas courts, when the question is considered, will determine that sales of depreciated owner-user equipment, *even when such sales are quite numerous,* will not remove the seller from the category of "occasional seller" [and place him in the category of one "engaged in the business of selling"] . . ., if the sales are of equipment used by the seller in its business and not otherwise any part of a line of products or goods sold by the seller in its ordinary course of business.

(Emphasis supplied.) Since Georgia-Pacific uses sawmill trimmers in its business to produce a "line of products," which consists of building materials, pulp, paper, packaging, chemicals, and plastics, the district court granted summary judgment for Georgia-Pacific.[4]

On appeal, Galindo argues, not only that the district court erred in finding Georgia-Pacific to be an occasional seller, but that we should reverse with directions to enter a partial summary judgment that Georgia-Pacific is engaged in the business of selling for strict liability purposes.[5]

---

**2.** George Middlebrook, the owner of Middlebrook Lumber, testified by deposition that his company purchased the trimmer from Modern Iron Works. Georgia-Pacific's records unequivocally establish that its trimmer was sold to Rice. For purposes of the summary judgment motion, the district court assumed that Rice sold the Georgia-Pacific trimmer to Modern Iron Works who in turn sold it to Middlebrook.

**3.** Galindo did not file a cross-motion for summary judgment on the "business of selling" issue. His arguments would have been more appropriate if he claimed that genuine issues of material fact exist with respect to Georgia-Pacif-

ic's status, rather than that the record conclusively shows that the company is engaged in the business of selling.

**4.** The district court also severed Galindo's claims against Georgia-Pacific from the rest of the lawsuit to create the final judgment from which Galindo appeals.

**5.** If the record warrants, we may direct entry of summary judgment in favor of Galindo even though Galindo did not file his own cross-motion for summary judgment in the district court. *See* C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil* 2d § 2716 (1983).

This argument is based on a liberal reading of Georgia-Pacific's affidavit to assert that the company "usually" disposes of used equipment by sale, together with an inference, from Georgia-Pacific's corporate size, that such sales are quite numerous. Georgia-Pacific argues, on the other hand, that the affidavit cannot reasonably be construed as an admission that Georgia-Pacific "usually" sells its retired equipment; moreover, Galindo cannot rely on an unsubstantiated inference from Georgia-Pacific's size alone that used equipment sales are numerous. Finally, Georgia-Pacific argues that the district court correctly determined that the Texas Supreme Court would hold that a seller of depreciated equipment used to produce goods, the production and sale of which constitute the seller's primary business, is not engaged in the business of selling such equipment.

## II.

### *Summary Judgment*

 Texas substantive law, of course, governs this diversity suit. *See Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Rule 56, Fed.R. Civ.P., however, governs the propriety of summary judgment. Summary judgment "may be granted only if it appears from pleadings, depositions, admissions and affidavits, considered in the light most favorable to the non-moving party, that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *United States v. An Article of Drug,* 725 F.2d 976, 984 (5th Cir.1984). Georgia-Pacific, as the moving party, had the burden to show that no genuine issue of material fact exists. *Id.* If Georgia-Pacific successfully dis-

charged this burden, the burden shifted to Galindo to "counter [Georgia-Pacific's] affidavits with opposing affidavits or other competent evidence setting forth specific facts to show that there is a genuine issue of material fact for trial." *Id.* at 984–85. If the burden shifted, Galindo could not demonstrate a fact issue by "resting on the mere allegations of [his] pleadings." *Russell v. Harrison,* 736 F.2d 283, 287 (5th Cir.1984). In fact, unsupported allegations or affidavits setting forth "ultimate or conclusory facts and conclusions of law" are insufficient to either support or defeat a motion for summary judgment. C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil* 2d § 2738 (1983). Moreover, the district court was obliged to resolve all reasonable factual inferences from the record in favor of Galindo, the nonmovant. *See Hodges v. Exxon Corp.,* 727 F.2d 450, 452 (5th Cir.1984). We are governed by the same principles on appeal. *See Russell v. Harrison,* 736 F.2d at 287. With these principles in mind, we turn to a review of the law governing the substantive issue raised by Georgia-Pacific's motion, followed by a review of the summary judgment proof.

## III.

### *Texas Law of Strict Liability*

 Texas has adopted section 402A of the Restatement (Second) of Torts.[6] *See McKisson v. Sales Affiliates, Inc.,* 416 S.W.2d 787 (Tex.1967). Section 402A imposes liability, without regard to privity of contract or the degree of care exercised by the defendant, on those who sell defective products that are unreasonably dangerous. Liability only attaches, however, if the sell-

---

**6.** Section 402A provides:

 (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

 (a) the seller is engaged in the business of selling such a product, and

 (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

 (2) The rule stated in Subsection (1) applies although

 (a) the seller has exercised all possible care in the preparation and sale of his product, and

 (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

er "is engaged in the business of selling" the product that causes harm. Comment f to section 402A[7] makes clear that strict liability for product defects does not apply to "the occasional seller ... who is not engaged in that activity as a part of his business." Comment f does not, however, create a test of easy application for distinguishing the occasional seller from one engaged in the business of selling. Our research confirms the district court's conclusion that Texas courts have yet to address this distinction in detail. Unfortunately, the absence of a definitive answer from the Texas courts or legislature, and of a procedure for certifying the question to the Texas Supreme Court, does not relieve us of the obligation to decide this issue: "Where no state court has decided the issue a federal court must 'make an educated guess as to how that state's supreme court would rule.'" *Nobs Chemical, U.S.A., Inc. v. Koppers Co.*, 616 F.2d 212, 214 (5th Cir. 1980) (quoting *Benante v. Allstate Insurance Co.*, 477 F.2d 553, 554 (5th Cir.1973)).

Ordinarily, the educated guess of a district court sitting in the state whose law is at issue is entitled to great weight on appeal. *See Smith v. Mobil Corp.*, 719 F.2d 1313, 1317 (5th Cir.1983). We are nonetheless obliged ourselves to review the district court's *Erie* guess in the light of existing state law. Moreover, in doing so, we remain mindful of our role in the system; it is not for us to adopt innovative theories of recovery or defense for Texas law, but simply to apply that law as it currently exists.[8] We turn now to that task.

■ The district court determined that the Texas courts would exempt from liability, on an occasional seller rationale, those who sell "depreciated owner-user equipment ... if the ... equipment [was] used by the seller in its business and [is] not otherwise any part of a line of products or goods sold by the seller in its ordinary course of business." The court apparently concluded that Texas courts would reach this result regardless of the number of

---

7. Comment f provides:

 *f. Business of selling.* The rule stated in this Section applies to any person engaged in the business of selling products for use or consumption. It therefore applies to any manufacturer of such a product, to any wholesale or retail dealer or distributor, and to the operator of a restaurant. It is not necessary that the seller be engaged solely in the business of selling such products. Thus the rule applies to the owner of a motion picture theater who sells popcorn or ice cream, either for consumption on the premises or in packages to be taken home.

 The rule does not, however, apply to the occasional seller of food or other such products who is not engaged in that activity as a part of his business. Thus it does not apply to the housewife who, on one occasion, sells to her neighbor a jar of jam or a pound of sugar. Nor does it apply to the owner of an automobile who, on one occasion, sells it to his neighbor, or even sells it to a dealer in used cars, and this even though he is fully aware that the dealer plans to resell it. The basis for the rule is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings with products which may endanger the safety of their persons and property, and the forced reliance upon that undertaking on the part of those who purchase such

goods. This basis is lacking in the case of the ordinary individual who makes the isolated sale, and he is not liable to a third person, or even to his buyer, in the absence of his negligence. An analogy may be found in the provision of the Uniform Sales Act, § 15, which limits the implied warranty of merchantable quality to sellers who deal in such goods; and in the similar limitation of the Uniform Commercial Code, § 2–314, to a seller who is a merchant. This Section is also not intended to apply to sales of the stock of merchants out of the usual course of business, such as execution sales, bankruptcy sales, bulk sales, and the like.

8. In *Rhynes v. Branick Manufacturing Corp.*, 629 F.2d 409, 410 (5th Cir.1980), we explained our role as follows:

 In matters of Texas substantive law, our relationship to the Texas Supreme Court is all but identical to that of a Texas intermediate appellate court. Indeed, if it differs at all, as regards substantive innovation it is weaker instead of stronger than that of such a court. Even in the rare case where a course of Texas decisions permits us to extrapolate or predict with assurance where that law would be had it been declared, we should perhaps—being out of the mainstream of Texas jurisprudential development—be more chary of doing so than should an inferior state tribunal.

sales or the extent of sales efforts.[9] We cannot agree. To assess the validity of this determination, we begin with the rationale underlying strict liability for product defects. Comment c to section 402A provides the following justifications for strict liability: (1) those engaged in the business of selling products have assumed a special responsibility to the public; (2) the public is often forced to rely on commercial sellers and has a right to expect that they will stand behind their products; and (3) the commercial seller is better able to spread the loss caused by defective products. The Texas courts have not only adopted the rule of section 402A but have apparently embraced this statement of its rationale. *See Pittsburg Coca-Cola Bottling Works v. Ponder,* 443 S.W.2d 546, 548 (Tex.1969). The Texas Supreme Court has indicated that section 402A was adopted to further the goals of (1) equitable loss distribution and (2) risk minimization. *See, e.g., Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 425, 432 (Tex.1984) ("equitable and rational risk distribution

[is] a fundamental policy underlying ... strict products liability"; between consumer and retailer, retailer should bear the loss; between innocent retailer and manufacturer, manufacturer should indemnify); *Darryl v. Ford Motor Co.,* 440 S.W.2d 630, 633 (Tex.1969) (extending § 402A to bystanders "to minimize risks of personal injury and/or property damages"); *Hovenden v. Tenbush,* 529 S.W.2d 302 (Tex.Civ. App.—San Antonio 1975, no writ) (§ 402A applies to intermediate seller of used goods; rejecting representational theory of strict liability in favor of enterprise theory expressed in comments to § 402A).[10]

■■■■ It is clear that the rationale for imposition of strict liability is served only if the defendant is *in the business* of releasing products into the stream of commerce. The existence of a business justifies consumer reliance and the assumption that the seller has undertaken a special responsibility for product safety, and supplies the mechanism for loss spreading. According to comment f, "[t]he basis for

**9.** Perhaps, by including the phrase "not otherwise any part of a line of products or goods sold by the seller in its ordinary course of business," the district court recognized that there may be circumstances in which the seller of retired equipment used in the seller's primary business is "engaged in the business of selling" the used equipment. If so, the district court nonetheless erred because the court did not inquire whether any of those circumstances obtain here. As we develop later, Georgia-Pacific's affidavit does not demonstrate that there are no remaining fact questions that are material to this issue.

**10.** Moreover, Texas cases have applied section 402A in a manner consistent with this statement of its underlying rationale. For example, the Texas courts have not demanded literal adherence to section 402A's requirement that the defendant "sell" the product. Strict liability applies to those who lease products. *See Rourke v. Garza,* 530 S.W.2d 794, 800 (Tex.1975). It also applies to those who distribute free samples in the hopes of making future sales. *See McKisson,* 416 S.W.2d at 792. *See also Davis v. Gibson Products Co.,* 505 S.W.2d 682, 691 (Tex.Civ.App. —San Antonio 1973) (strict liability applies to defendant who displays defective product in retail store in hopes of making sale, though no sale has yet occurred), *writ ref'd n.r.e.,* 513 S.W.2d 4 (Tex.1974). Though no sale has occurred, the rationale for strict liability is per-

ceived by Texas courts to apply equally to parties, like the ones in these cases, who have "introduc[ed] products into the channels of commerce." *Rourke,* 530 S.W.2d at 800.

Texas courts have not been reluctant, however, to refuse extension of section 402A in cases in which its rationale is thought not to apply. In *Armstrong Rubber Co. v. Urquidez,* 570 S.W.2d 374 (Tex.1978), for example, the Texas Supreme Court reversed a strict-liability judgment against a tire manufacturer for injuries caused by the blow-out of an allegedly defective tire. The manufacturer supplied the tire to a testing firm with whom it had contracted to test its products. The court held that, because the tire had not been released in some manner to the consuming public (i.e., had not been placed into the stream of commerce), strict liability did not apply to such a "bailment for mutual benefit." Likewise, in *Hernandez v. Southern Pacific Transportation Co.,* 641 S.W.2d 947 (Tex.App.—Corpus Christi 1982, no writ), the court held that strict liability could not be imposed on a railroad company that supplied a stanchion to its wholly-owned trucking subsidiary for use by an employee of the trucking company in unloading trailers from railroad cars. In the court's view, the railroad company had not placed the stanchion into the channels of commerce. *See also Thate v. Texas & Pacific Ry.,* 595 S.W.2d 591 (Tex.Civ.App.—Dallas 1980, no writ) (same).

the rule [that occasional sellers are not strictly liable] is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings with products which may endanger [their] safety ..., and the forced reliance upon that undertaking on the part of those who purchase such goods." The comment provides two examples of occasional sellers: (1) "the housewife who, on one occasion, sells to her neighbor a jar of jam or a pound of sugar" and (2) "the owner of an automobile who, on one occasion, sells it to his neighbor or even sells it to a dealer in used cars." These examples involve "ordinary individual[s] who make[ ] isolated sale[s]," a category into which Georgia-Pacific obviously does not fall. The rationale expressed in comment f, however, reveals that the occasional seller category is not necessarily limited to such facts. At least on the face of comment f, the occasional seller category applies where sales are so infrequent or sales efforts are so minimal that it cannot be said that the seller has voluntarily assumed a special responsibility for product safety, that the public has the right to expect that the seller will stand behind the product, or that the seller is best able to spread the loss caused by the product's defects.

As we have already noted, there is no Texas case discussing in detail the requirement that the defendant be engaged in the business of selling the defective product. The district court based its analysis on the following prerequisites to section 402A liability which the court distilled from the Texas cases: "(1) [a] commercial or commercially based transaction is required" and "(2) ... the source of the product must have more than a merely incidental relationship to the transaction, arising either because the product is one the source produces, distributes, or otherwise has a vested interest in placing into the stream of commerce, or because the manner in which the product is passed from the source to the user creates the comment f 'forced reliance.'" (Citations omitted.) Even if we agree that this is a fair summary of Texas law, we do not believe that it necessarily follows that "getting rid of the depreciated equipment used for production of the goods and services that constitute the business of the seller" can never constitute a business in which the seller is engaged.

The first principle upon which the district court based this conclusion—that a transaction must be commercial—simply means that the product must be made available to the consuming public. See Armstrong Rubber, 570 S.W.2d at 376 (stream of commerce means "release[ ] in some manner to the consuming public"); Thate, 595 S.W.2d at 598 ("[c]hannels of commerce implies that a product is placed for use by or sale to the consuming public"). Clearly, the sale of depreciated equipment may be commercial in this sense. The second principle—that the seller must have a vested interest in placing the product into the stream of commerce or must create forced reliance on the part of consumers—might also exist in the context of depreciated equipment sales. Suppose, for example, that Georgia-Pacific has a policy of purchasing new equipment at all of its sawmills every five years. Suppose further that Georgia-Pacific has a division or department devoted to selling the used equipment, that the department advertises the availability of equipment on a widespread basis, and that it realizes substantial revenues from this activity. Clearly, on such facts, Georgia-Pacific would not be exempted from section 402A liability simply because the equipment is used. In Hovenden, 529 S.W.2d at 302, the court rejected the argument that a seller of used equipment, as opposed to the manufacturer, cannot be held liable under section 402A. Significantly, the court reached its holding by specifically relying on the enterprise theory of liability expressed in the comments to section 402A. Moreover, we can discern no other reason why the rationale underlying section 402A would not apply to the hypothetical case we have described. On such facts, the consuming public might well expect Georgia-Pacific to stand behind the equipment it sells; Georgia-Pacific would

have a vested interest in placing the equipment into the stream of commerce, and would be equipped to spread the loss caused by defective equipment. The rationale underlying section 402A's strict liability would apply to Georgia-Pacific to the same extent that it would to a used equipment dealer that did not happen to be the same entity that used the equipment in the first instance. *Cf. Gilbert v. Stone City Construction Co.*, 171 Ind.App. 418, 357 N.E.2d 738, 742 (1976) (reversing directed verdict; evidence that construction company routinely leased equipment that it temporarily did not need in its own construction activities would support finding that company was in the business of leasing equipment).

The district court cited no authority that compels a conclusion that Texas courts would construe the occasional seller doctrine to embrace all sellers of depreciated equipment that had been used in the seller's business without regard to the extent of sales activities. Texas courts have given no indication that such a rule is imminent and analogous cases from other jurisdictions do not support such a rule. In fact, our review of the caselaw reveals that most of the decisions that have found the seller of depreciated equipment used in the seller's business to be an "occasional seller" involved a single sale or transaction in which the rationale for imposition of strict liability was lacking.[11] In *Bruce v. Martin-Marietta Corp.*, 544 F.2d 442 (10th Cir. 1976) (applying Oklahoma law), which the district court found helpful, the defendant-airline sold about forty airplanes that it had used in its air transportation business.

One of the airplanes crashed while operated by a charterer to whom it eventually had been sold, and an attempt was made to impose strict liability upon the defendant-airline, an intermediate owner. The Tenth Circuit affirmed summary judgment for the airline on the ground that it was not engaged in the business of selling airplanes. The court found that "[t]he number of planes sold is not determinative." *Id.* at 448. This case does not, however, stand for the proposition that the sale of equipment used in a party's primary business can *never* itself constitute a business in which the party is engaged. The court based its decision on the fact that "[t]he record contains nothing to show that any person buying this used plane, or any customer of that person, placed, or would have placed, any reliance on any conduct of [defendant]." *Id.* at 449. Although forty planes were sold, they were apparently sold in a single transaction. Nothing said in *Bruce* is inconsistent with our conclusion that there may exist circumstances in which a seller of equipment used in the seller's primary business, by virtue of the extent of sales efforts, has created justified reliance or otherwise implicated the rationales underlying the imposition of section 402A liability.

In short, we find no basis for the district court's conclusion that the Texas Supreme Court will ultimately determine that the seller of depreciated equipment used in his primary business will never be considered engaged in the business of selling such equipment. Rather, we believe that there may well exist circumstances in which, because of the number of sales or

11. *See, e.g., Bailey v. ITT Grinnell Corp.*, 536 F.Supp. 84 (N.D.Ohio 1982) (applying Ohio law) (summary judgment in favor of seller of single punch press used in seller's manufacturing business); *Siemen v. Alden*, 34 Ill.App.3d 961, 341 N.E.2d 713, 715 (1975) (summary judgment in favor of seller where "only sale of a saw or sawmill equipment was to plaintiff"); *McKenna v. Art Pearl Works, Inc.*, 225 Pa.Super. 362, 310 A.2d 677, 680 (1973) (summary judgment in favor of seller who, "in an effort to terminate its business operations, sold all its corporate assets"); *Daniels v. McKay Machine Co.*, 607 F.2d 771 (7th Cir.1979) (applying Illinois law) (summary judgment for lessor of entire plant which included an allegedly defective "hot shear" machine); *Bevard v. Ajax Manufacturing Co.*, 473 F.Supp. 35, 39 (E.D.Mich.1979) (applying Michigan law) (summary judgment for "one shot" seller of press used in its business); *Luna v. Rossville Packing Co.*, 54 Ill.App.3d 290, 12 Ill. Dec. 115, 369 N.E.2d 612 (1977) (summary judgment for party who leased the only conveyor it owned to its own corporation); *Balido v. Improved Machinery, Inc.*, 29 Cal.App.3d 633, 639, 105 Cal.Rptr. 890, 895 (1972) ("one-time" sale of molding press). *See generally* Annot., 99 A.L. R.3d 651 (1980).

the extent of sales activities, a seller of depreciated equipment would fit squarely within the rationale for imposition of strict liability as it has been recently stated by the Texas courts. It would be premature on the record before us to attempt a definitive delineation of those circumstances. The relevant inquiry, however, is whether the seller's conduct would justify a conclusion that (1) he has undertaken a special responsibility for product safety; (2) the public has a right to expect that he will stand behind the product; and (3) as between the consumer and the seller, it is equitable to impose upon the seller the loss caused by the product and the burden of spreading that loss as a cost of doing business.

### IV.

#### The Summary Judgment Proof

The summary judgment record consists of a meager showing on the issue of Georgia-Pacific's status as a business seller of used sawmill equipment. The affidavit of Arnold Jones, the plant manager of Georgia-Pacific's Arkansas plant, establishes that (1) the trimmer was sold in 1978 because it was no longer needed in the operation of the Arkansas plant; (2) Georgia-Pacific only sells sawmill trimmers and other used equipment when it decides to take equipment out of service at its plants or sawmills; and (3) Georgia-Pacific does not sell every piece of used sawmill equipment that it takes out of service; some equipment is "scrapped" or transferred to other plants or sawmills within the corporation. The affidavit also states the conclusion that Georgia-Pacific "is not in the business of selling trimmers."

 Galindo did not specifically counter the averments of the affidavit. We conclude, however, that the affidavit did not discharge Georgia-Pacific's burden of showing that there are no genuine issues of material fact and that Georgia-Pacific is entitled to judgment as a matter of law. We note first that the affidavit's statement that Georgia-Pacific is not engaged in the business of selling sawmill trimmers is merely a conclusion which could not shift the summary judgment burden to Galindo. As we read Texas law, a determination whether one is engaged in the business of selling depends on an analysis of the totality of the circumstances surrounding sales efforts, in the light of the rationale underlying imposition of strict liability. Whether a finding that one is engaged in the business of selling is labelled a conclusion of law, a mixed question of law and fact, or an ultimate fact, the general statement that Georgia-Pacific is not engaged in the business of selling trimmers, without reference to the specific nature of sales activities, is not competent summary judgment proof. We have long recognized that mere statements of conclusions of law or ultimate fact cannot shift the summary judgment burden to the nonmovant. *See, e.g., Gossett v. Du-Ra-Kel Corp.,* 569 F.2d 869, 872 (5th Cir.1978) (conclusory, "bald assertions of ultimate facts are ordinarily insufficient to support summary judgment"); *Benton-Volvo-Metairie, Inc. v. Volvo Southwest, Inc.,* 479 F.2d 135, 138–39 (5th Cir.1973) (nonmovant survives motion for summary judgment, without countering movant's showing, where movant's affidavit "set forth only ultimate facts or conclusions"); *Dawkins v. Green,* 412 F.2d 644, 646 (5th Cir.1969) (same); *Bridges v. Internal Revenue Serv.,* 433 F.2d 299, 300 (5th Cir.1970) (bare, conclusory allegations that defendant was within scope of authority cannot sustain summary judgment); C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil* 2d § 2738 (1983). In *Chavers v. Exxon Corp.,* 716 F.2d 315, 318 (5th Cir.1983), we vacated a summary judgment that, for purposes of the statutory-employer section of the Louisiana workers' compensation law, defendant's trade, business, or occupation included oil drilling operations. Summary judgment was based on defendant's conclusory affidavit that its "trade[,] business and occupation is the location, production and sale of oil and gas." We vacated because resolution of the issue of defendant's status under Louisiana law depended

on a subsidiary showing, on which the affidavit was silent, that defendant or others in its industry customarily conducted drilling operations with their own employees, rather than subcontractors. The conclusory statement that Georgia-Pacific is not engaged in the business of selling used sawmill equipment, like the conclusory statement in *Chavers,* "offers no enlightenment" on matters that, in our view, are "essential to a proper disposition of the motion for summary judgment." *Id.* at 318. *See also Pitts v. Shell Oil Co.,* 463 F.2d 331, 334 (5th Cir.1972) (on issue whether plaintiff was employee or independent contractor, which depends on who has right to control the details of the work, self-serving conclusions of defendant's affidavit cannot support summary judgment); *Fowler v. Southern Bell Telephone & Telegraph,* 343 F.2d 150, 154 (5th Cir.1965) (defendant's sworn, conclusory statements, unsupported by specific facts, that they were acting within scope of employment could not support summary judgment).

■ Absent the conclusory claim that Georgia-Pacific is not engaged in the business of selling sawmill trimmers, the affidavit cannot support the summary judgment. The affidavit leaves many material fact questions about Georgia-Pacific's sales of used sawmill equipment unanswered. For example, Georgia-Pacific made *no* showing with respect to (1) the number of used equipment sales made by Georgia-Pacific; (2) the amount of revenue generated by those sales; (3) the number of employees or the extent of other corporate resources devoted to making the sales; or (4) the use of advertising or other marketing techniques to publicize the availability of used equipment for sale. While summary judgment may have been proper under the district court's view of Texas law, under which these questions are immaterial, it cannot stand under our understanding of comment f. Since the affidavit leaves open the possibility that these questions will be answered in a manner favorable to Galindo, summary judgment for Georgia-Pacific was improper.

Georgia-Pacific's reliance on *Bailey v. ITT Grinnell Corp.,* 536 F.Supp. at 84, is misplaced. In *Bailey,* defendant purchased a punch press, used it in its business for a number of years, and then sold it through a used equipment broker. The district court, applying Ohio law, granted summary judgment for the defendant on the ground that the sale was an occasional sale exempted by comment f from section 402A liability. Defendant admitted selling the punch press that allegedly caused plaintiff's injuries, but submitted an affidavit that stated it "is not and has never been, a designer, manufacturer, assembler, marketer, rebuilder, distributor, retailer, or seller of punch presses." The court held that this affidavit was sufficient to shift the burden to the plaintiff to demonstrate a fact question for trial. The court further held that plaintiff could not discharge that burden by reliance on the claim that "[defendant's] corporate size creates an inference that [defendant] transfers numerous presses."

In *Bailey,* there was nothing in the record to indicate that defendant had made other sales of punch presses. The affidavit stated that, but for the sale of the press involved in the case, defendant had never been a seller of punch presses. In this case, on the other hand, Galindo does not have to infer from Georgia-Pacific's size that it has made more than one sale. The affidavit itself states that other sales have in fact been made. Moreover, the affidavit does not make a prima facie showing that, although other sales have been made, sales efforts do not rise to the level of a business in which Georgia-Pacific is engaged. On the record before us, that is an open question. *Cf. Walker v. Skyclimber, Inc.,* 571 F.Supp. 1176, 1179 (D.V.I.1983) (affidavit that defendant "is not in the business of selling, distributing, advertising, or maintaining any sales agency," sufficient to shift summary judgment burden; nothing in the record to indicate that other sales had been made).

What we have said thus far obviously disposes of Galindo's claim that the record

conclusively shows that Georgia-Pacific is in fact engaged in the business of selling used sawmill trimmers. There is simply not enough evidence in the record to say, one way or the other, whether Georgia-Pacific is engaged in the business of selling used sawmill equipment. Since Georgia-Pacific did not discharge its summary judgment burden, the judgment must be vacated, without prejudice to the possibility of resolution of the issue by summary judgment on an adequate record.

## V.

### Conclusion

For the reasons set forth above, the summary judgment is vacated, and the case is remanded for proceedings consistent with this opinion. Georgia-Pacific shall bear the costs of this appeal.

VACATED and REMANDED.